UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

INTERSTATE INDEMNITY COMPANY,                    Case No. 07-CV-4029 (PJS/JJG)

                Plaintiff,

v.

RONALD ULVEN,
ALERIO THOMAS VANYO, and
BUY-RITE AUTO SALES, INC.,

                Defendants.

RONALD ULVEN,

                Counterclaimant,

                                    ORDER GRANTING IN PART AND
v.                                 DENYING IN PART PLAINTIFF'S
                                    MOTION FOR SUMMARY JUDGMENT
INTERSTATE INDEMNITY COMPANY,

                Counterdefendant.

ALERIO THOMAS VANYO,

                Third-Party Plaintiff,

v.

BUY-RITE AUTO SALES, INC.,

                Third-Party Defendant.

Paulette S. Sarp and Bethany K. Culp, HINSHAW & CULBERTSON LLP, for plaintiff.

Sharon L. Van Dyck, VAN DYCK LAW FIRM; and William O. Bongard, SIEBEN, GROSE, VON HOLTUM, & CAREY, LTD., for defendant Ronald Ulven.

This action arises out of an automobile-pedestrian accident in which a vehicle driven by

defendant Alerio Vanyo struck defendant Ronald Ulven. At the time of the accident, Ulven

owned and Vanyo was employed by defendant Buy-Rite Auto Sales, Inc. ("Buy-Rite"), and Buy-

Rite was insured by plaintiff Interstate Indemnity Company ("Interstate"). Interstate now seeks a declaration that it does not owe any insurance benefits to Ulven in connection with the accident. Ulven counterclaims against Interstate for a declaration of coverage, and Vanyo brings a third-party complaint against Buy-Rite for indemnification.[1]

This matter is before the Court on Interstate's motion for summary judgment on its claims against Ulven, Vanyo, and Buy-Rite, and on Interstate's motion for summary judgment on Ulven's counterclaim against it. For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

### A. Buy-Rite and the Accident

Ulven is the sole owner of Buy-Rite, a used-car dealership. R. Ulven Aff. ¶ 2; Ulven Dep. 35-36, July 30, 2008 [hereinafter "Ulven II Dep."]. Ulven is also an employee of the business. In November 2004, Buy-Rite hired Vanyo as a lot technician. Ulven II Dep. 70-71. Vanyo's duties included driving cars to and from auctions, picking up cars from other dealers, and moving cars around the Buy-Rite lot. Vanyo Dep. 16-17, Nov. 28, 2007 [hereinafter "Vanyo I Dep."]. Vanyo also performed basic maintenance on Buy-Rite's cars. He checked vehicle fluids, filled tires, changed batteries, and put gas in the tanks. Vanyo I Dep. 17. During the time period relevant to this action, Buy-Rite normally had about one hundred cars in its inventory. Ulven Dep. 36, Nov. 28, 2007 [hereinafter "Ulven I Dep."].

On January 14, 2006, Vanyo was asked to retrieve a car from inside of a garage on the Buy-Rite lot and drive the car around to the front of the business. Vanyo got in the car, started

---

[1]Vanyo filed his third-party complaint before Interstate added Buy-Rite as a defendant, which is why Vanyo's claim is labeled a third-party complaint rather than a crossclaim.

it, and, as Ulven opened the garage door, began backing it up. Ulven I Dep. 34, 38. Vanyo

somehow lost control of the car, which suddenly accelerated backward, striking and seriously

injuring Ulven. Ulven I Dep. 38.

### B. The Insurance Policy

At the time of the accident, Buy-Rite was the named insured on a garage-liability policy

(the "Policy") issued by Interstate. *See* Sarp Aff. Ex. A, Jan. 9, 2009 [hereinafter "Policy at

___"].[2] Ulven purchased the Policy on Buy-Rite's behalf by submitting an application to his

insurance broker. As was their usual practice, Ulven's broker filled out the application and sent

it to Ulven, who then signed and returned it. Ulven II Dep. 55-56. The application, which was

dated September 21, 2005, asked for the names of all Buy-Rite employees as well as information

about their driving records for the preceding three years. Van Dyck Aff. Ex. 12. Although Buy-

Rite had hired Vanyo in November 2004 — almost a year earlier — the application did not

mention him. *Id.* And, in fact, Ulven never contacted his insurance broker or Interstate to

inform them about Vanyo's hiring. Lloyd Dep. 88-89.

One possible reason why Ulven never informed his insurer about Vanyo is that Vanyo's

driving record was awful. It included a charge for driving while intoxicated in April 2002, a

conviction for reckless driving in June 2002, and multiple speeding convictions in 2004 and

2005. Vanyo Dep. 20, 22-23, 30, Oct. 30, 2008 [hereinafter "Vanyo II Dep."]; Sarp Aff. Ex. T,

Jan. 9, 2009 [hereinafter "Sarp Aff."]. Interstate would not likely be anxious to insure such a

risk. Ulven nevertheless denies intentionally concealing Vanyo from Interstate and contends that

---

[2]The Policy is not consistently paginated. The Court's citations refer to the electronic
case filing page numbers printed on the top right corner of Docket No. 7-2.

Vanyo's employment was reflected in Buy-Rite's payroll records, which he made available to Interstate. R. Ulven Aff. ¶¶ 6-7, 12.

After the accident, Ulven filed a lawsuit against Vanyo in state court, seeking to recover damages for his injuries. Sarp Aff. Ex. Q. Interstate is defending Vanyo in that lawsuit under a reservation of rights. Ulven also submitted a claim for benefits under the Policy, which Interstate denied. Sarp Aff. Ex. R.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

The parties agree that Minnesota law applies in this diversity case.

## B. Interstate's Motion

Ulven originally sought three types of insurance benefits under the Policy in connection with the January 2006 accident: (1) liability coverage for Vanyo; (2) uninsured or underinsured motorist ("UM/UIM") benefits; and (3) personal-injury protection ("PIP") benefits, which are also sometimes referred to as no-fault or basic economic-loss benefits. Ulven has now conceded, however, that the Policy does not provide liability coverage to Vanyo for the accident, and Vanyo has not argued otherwise. The Policy explicitly excludes from liability coverage any bodily injury to "[a]n employee of the 'insured' arising out of and in the course of employment by the 'insured'[.]" Policy at 26. There is no question that Ulven was an employee of the "insured" (Buy-Rite), and no question that, in his lawsuit against Vanyo, he seeks to recover for bodily injury that "ar[ose] out of and in the course of [his] employment by [Buy-Rite]." *Id.* Interstate is therefore entitled to a declaration that it does not owe a duty to indemnify Vanyo for any liability arising out of the accident.

Interstate also seeks a declaration that it owes no duty to indemnify Buy-Rite. Although Ulven has not conceded the point, it is clear that the exclusion that precludes liability coverage for Vanyo applies with equal force to Buy-Rite. *See* Policy at 26 (excluding liability coverage for bodily injury to an employee of the insured, whether or not the insured may be liable as an employer or in any other capacity). Buy-Rite has not argued otherwise. Thus, Interstate is entitled to a declaration that it does not owe a duty to indemnify Buy-Rite for any liability arising out of the accident.

Finally, Interstate moves for a declaration that it does not have a duty to defend Vanyo or Buy-Rite against any claims arising out of the accident. *See* Docket No. 61 ¶¶ A, B. Although the parties have not expressly addressed the duty to defend in their briefs, the Court has already

held that there is no liability coverage under the Policy for any accident-related claims against Vanyo or Buy-Rite. Consequently, Interstate has no duty to defend Vanyo or Buy-Rite against such claims. *State Farm Fire & Cas. Co. v. Williams*, 355 N.W.2d 421, 425 (Minn. 1984) ("If, as a matter of law, there is no duty to indemnify, there exists no duty to defend the main action.").

Having found no liability coverage for Vanyo and Buy-Rite, the Court now turns to the question of whether Ulven can recover either UM/UIM benefits or PIP benefits.

### 1. Voidability[3]

Interstate argues that, pursuant to Minn. Stat. § 60A.08, subd. 9, the entire Policy is voidable on two separate grounds. First, Interstate argues that the Policy is voidable because Ulven intentionally deceived Interstate by omitting any mention of Vanyo or his driving record from the application. Second, Interstate argues that, even if the misrepresentation was innocent, the Policy is nevertheless voidable because the information omitted from the application — specifically, Vanyo's employment and poor driving history — increased the risk of loss to Interstate.

Interstate originally sought summary judgment on both of these grounds, but Interstate subsequently conceded that whether Ulven acted with the intent to deceive Interstate is a disputed issue of fact that must be resolved by a jury. Interstate continues to argue, though, that it is entitled to summary judgment because the information that was concealed from Interstate increased the risk of loss.

---

[3]Ulven argues that because Interstate failed to seek avoidance of the Policy in its pleadings, it cannot now do so. But Interstate has been diligent in raising and pursuing this claim since the facts supporting it first came to light during discovery, and Ulven has not been prejudiced by Interstate's failure to plead it. The Court will therefore permit Interstate to raise this claim.

*a. Application of Minn. Stat. § 60A.08*

Minnesota law limits the circumstances under which an insurance policy may be voided

because the insured provided inaccurate information to the insurer:

> No oral or written misrepresentation made by the assured, or in the
> assured's behalf, in the negotiation of insurance, shall be deemed
> material, or defeat or avoid the policy, or prevent its attaching,
> unless made with intent to deceive and defraud, or unless the
> matter misrepresented increases the risk of loss.

Minn. Stat. § 60A.08, subd. 9 [hereinafter "§ 60A.08"]. Under this statute, then, an insurer may

void a policy on the basis of an unintentional misrepresentation only if the matter misrepresented

increased the risk of loss. *Preferred Risk Mut. Ins. Co. v. Anderson*, 152 N.W.2d 476, 479

(Minn. 1967).

The Policy issued to Buy-Rite, however, does not contain any language permitting

Interstate to void it on the basis of an *unintentional* misrepresentation — whether or not that

unintentional misrepresentation increased the risk of loss. Instead, the Policy provides that

Interstate will not pay for losses only when the insured has *intentionally* misrepresented a

material fact:

> [W]e will not pay for any "loss" or damage in any case of fraud by
> you at any time as it relates to this Coverage Form. We will not
> pay for any "loss" or damage if you or any other "insured," at any
> time, intentionally conceal or misrepresent a material fact
> concerning:
>
> a.    This Coverage Form;
> b.    The covered "auto";
> c.    Your interest in the covered "auto"; or
> d.    A claim under this Coverage Form.

Policy at 41-42.

At the first hearing on Interstate's motion, the Court questioned whether Interstate may void the Policy on the basis of an unintentional misrepresentation even though the Policy itself states that Interstate will not pay for losses only in the case of intentional misrepresentations. After all, an insurer and an insured are parties to a contract, and their rights and obligations are generally governed by the terms of that contract. If the contract provides that the insurer may void the policy only for intentional misrepresentations, why should the insurer be able to void the policy for unintentional misrepresentations as well? That, at least, was the Court's question. At the request of the Court, the parties submitted supplemental briefing and engaged in a second round of oral argument on this issue. Having considered the parties' briefs and arguments, the Court now holds that Interstate is entitled to void the Policy on the basis of unintentional misrepresentations that increased the risk of loss despite the Policy's lack of language to that effect.

The difficulty with this issue lies in the fact that there are two different ways to read § 60A.08. One could read § 60A.08 to affirmatively grant an insurer the right to void a policy under certain circumstances, whether or not the policy itself reserves such a right. Alternatively, one could read § 60A.08 to limit the grounds for voiding a policy that an insurer may insert into the policy. Ultimately, though, it would be up to the insurer to decide which of the grounds permitted under the statute would be inserted into the policy, and the rights and obligations of the parties would be governed by the policy language.

The Court continues to believe that the latter is a more natural reading of § 60A.08. But the Court is not writing on a clean slate. As Interstate points out, Minnesota cases have for decades applied § 60A.08 without analyzing whether the policy at issue permits avoidance on any particular ground. Indeed, there does not seem to be a single Minnesota case holding that,

before an insurer may void a policy for one of the reasons described in § 60A.08, the language of the policy must give the insurer that right. Thus, Minnesota courts appear — at least implicitly — to accept Interstate's position that § 60A.08 empowers insurers to void policies under certain circumstances regardless of policy language.

Interstate's reading is also supported by the legislative history of § 60A.08. Insurers in Minnesota have always had the right, under the common law, to void a policy on the basis of a misrepresentation — whether innocent or fraudulent — as long as the misrepresentation was material. Over a century ago, the Minnesota Supreme Court described this right as follows:

> In so far as the answers given to such questions [in the insurance application] were material, or may have been regarded by the insurer as being material, they must have been substantially true, in substantial accordance with the facts stated, or the policy would have been avoided, even though any misstatement was a mere representation, and not a warranty, and though it was made honestly, and not fraudulently.

*Perine v. Grand Lodge A.O.U.W.*, 53 N.W. 367, 368 (Minn. 1892).

True, *Perine* does not explicitly state that the insurer's right to void the policy derives from the common law rather than from the language of the policy. But *Perine* does not cite any policy language nor in any other way suggest that the specific language of a policy is relevant. More tellingly, *Perine* cites *Campbell v. New England Mutual Life Insurance Co.*, which makes the point explicitly: "It is true that misrepresentations defeat a policy without any provision to that effect in the policy itself." 98 Mass. 381, 393 (1867); *see Perine*, 53 N.W. at 368 (citing *Campbell*). In addition, other Minnesota cases from the same time period recognized that the right to void an insurance policy on the basis of material misrepresentations did not need to be embodied in the policy. *See Stensgaard v. St. Paul Real Estate Title Ins. Co.*, 52 N.W. 910, 911 (Minn. 1892) ("Where the contract itself does not stipulate the effect that a particular false

statement or representation shall have on the contract, or where it stipulates merely that the misrepresentation or suppression of a material fact shall avoid it, the fact misrepresented or suppressed must have been material, as an inducement to enter into the contract . . . .").

Toward the end of the nineteenth century, some insurers — apparently seeking broader authority to void policies than the common-law provided — began to contractually transform their insureds' representations into binding warranties. *See Price v. Standard Life & Accident Ins. Co.*, 95 N.W. 1118, 1119 (Minn. 1903); *Johnson v. Nat'l Life Ins. Co.*, 144 N.W. 218, 219 (Minn. 1913). Among other things, this had the effect of permitting insurers to void policies on the basis of misrepresentations that were *not* material.[4] *See First Nat'l Bank v. Nat'l Liberty Ins. Co. of Am.*, 194 N.W. 6, 7 (Minn. 1923) (describing "the common-law doctrine that a breach of a warranty in a policy of insurance avoids the policy, without regard to whether the statement warranted relates to a material or an immaterial fact"). In addition, warranties differ from representations in that the former must be strictly true, whereas the latter need be only substantially true. *Price v. Phoenix Mut. Life Ins. Co.*, 17 Minn. 497, 1871 WL 3288, at *5 (1871), *overruled on other grounds by Chambers v. Nw. Mut. Life Ins. Co.*, 67 N.W. 367, 368 (Minn. 1896). Unscrupulous insurance companies thus were able to use warranties to set traps for unwary policyholders and create unjustifiable "loopholes" for themselves.

Against this backdrop, the Minnesota Legislature enacted a precursor to § 60A.08 in 1895. That precursor contained language that was virtually identical to the language that now

---

[4]Some cases treated the warranty as the parties' contractual agreement that certain representations were to be deemed material. *See Stensgaard*, 52 N.W. at 911 ("But the parties may by their contract determine the materiality for themselves, as where they stipulate that if a statement of fact made by one of them, and set forth in the contract, be false, it shall avoid the contract. In such case the statement is in effect a warranty."). Either way, the effect was the same: The insurer was able to void the policy on the basis of inadvertent misstatements that were not material to the decision to cover the risk.

appears in § 60A.08. *See* 1895 Minn. Laws ch. 175 § 20 at 400 (Apr. 25, 1895); *Price*, 95 N.W.

at 1119. As courts have recognized from the beginning, the precursor to § 60A.08 was intended

to put an end to the practice of requiring strict compliance with immaterial warranties:

> Our statutes, and statutes like them, were intended to put
> warranties upon substantially the basis of representations, and to
> do away with defenses, made by incorporating conditions and
> terms in policies, making them by agreement material
> representations or warranties, and controlling on the right of
> recovery.

*Johnson*, 144 N.W. at 219; *see also Price*, 95 N.W. at 1119 ("This statute modifies and controls

the policy, and was designed to prevent unfair practices which had theretofore been adopted by a

few life and accident insurance companies . . . ."). Thus, no longer could an insurer void a

policy on the basis of a breach of an immaterial warranty. *See First Nat'l Bank*, 194 N.W. at 7

(explaining that the statute applies to warranties, although it does not by its terms mention

warranties).

Although the statute erased the distinction between warranties and representations, it did

not take away the right of an insurer — long protected by the common law — to void a policy on

the basis of *material* misrepresentations. Instead, as the many Minnesota cases applying the

statute seem to recognize (albeit implicitly), the statute codified that common-law right. *See,*

*e.g.*, *Preferred Risk*, 152 N.W.2d at 478-79 (describing a declaratory-judgment action seeking

rescission of a policy as "based upon" a precursor to § 60A.08, without delving into policy

language); *Nielsen v. Mut. Serv. Cas. Ins. Co.*, 67 N.W.2d 457, 459 (Minn. 1954) (describing a

precursor to § 60A.08 as "[t]he applicable and controlling statute in this case" without examining

policy language); *Indep. Sch. Dist. No. 197 v. Accident & Cas. Ins. of Winterthur*, 525 N.W.2d

600, 606 (Minn. Ct. App. 1995) (stating that the defendant insurers had a defense to coverage

under § 60A.08 without citing or relying on any policy language); *Farmers State Bank of Russell v. W. Nat'l Mut. Ins. Co.*, 454 N.W.2d 651, 652-53 (Minn. Ct. App. 1990) (explaining that, while § 60A.08 defeats an insured's interest in a policy, it does not apply to defeat a loss payee's interest, which is governed by the language of the policy); *Transamerican Ins. Co. v. Austin Farm Ctr., Inc.*, 354 N.W.2d 503, 507-08 (Minn. Ct. App. 1984) (stating that "section 60A.08, [which] allow[s] policy avoidance on misrepresentation that increased the risk of loss, is statutorily inserted into every contract of insurance"); *see also Doelger & Kirsten, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 167 N.W.2d 198, 201 (Wis. 1969) (stating that "the common law doctrine of misrepresentation in the law of insurance is governed in this state by" a statute similar to § 60A.08).

As noted, this Court was initially skeptical of Interstate's contention that § 60A.08 gives an insurer the right to void a policy on grounds that are not set forth in the policy itself. But Interstate's reading of § 60A.08 is supported by the statute's history. Before the statute was enacted, an insurer had a common-law right to void a policy on the basis of an unintentional material misrepresentation — a right that the insurer enjoyed even if the policy was silent on the matter. The statute was clearly intended to preserve that common-law right.

It is unfortunate that the wording of the statute, and the subsequent case law applying it, does not make this meaning more explicit. But since the original precursor to § 60A.08 was enacted over a century ago, no Minnesota court has ever examined whether the language of an insurance policy permitted the insurer to void the policy for any of the reasons described in the statute. The failure of this dog to bark speaks volumes. *See* III A. Conan Doyle, *Silver Blaze*, *in* Memoirs of Sherlock Holmes 1, 22 (Harper & Bros. 1904).

In sum, the Court concludes that § 60A.08 permits Interstate to seek avoidance of the Policy on the ground that Ulven, without intent to deceive or defraud, misrepresented a matter that increased the risk of loss, despite the fact that the Policy itself does not reserve such a right to Interstate.

### b. Risk of Loss

Interstate argues that the record conclusively shows that Ulven misrepresented a matter that increased the risk of loss — namely, Vanyo's identity and driving record. Although Ulven contended in his briefing that Interstate could have discovered Vanyo's employment with Buy-Rite because Ulven gave Interstate access to Buy-Rite's records, Ulven conceded at oral argument that at no time did he disclose Vanyo's identity or driving record to Interstate. It is therefore undisputed that Ulven made a misrepresentation by failing to disclose Vanyo's identity and driving record.[5]

The question, then, is whether the matter misrepresented increased the risk of loss. Interstate bears the burden of proof on this issue. *Nielsen*, 67 N.W.2d at 462. The phrase "increases the risk of loss" refers to the likelihood of future liability for a loss. *See Preferred*

---

[5]In *Pomerenke v. Farmers Life Insurance Co.*, the Minnesota Supreme Court held that when an insurance agent incorrectly fills out an insurance application and the insured then signs the application without reviewing it for accuracy, any misrepresentation in the application is chargeable to the insurer and thus is not a basis for avoiding the policy. 36 N.W.2d 703, 706 (Minn. 1949).

In this case, it is undisputed that Ulven signed the insurance application only after it was completed by an insurance broker. But Ulven does not contend that *Pomerenke* applies, most likely because Ulven conceded at his deposition that the broker was acting as Buy-Rite's agent rather than as Interstate's agent. Ulven II Dep. 29; *Pomerenke*, 36 N.W.2d at 706 ("The rule, however, is confined strictly to those instances where the application is made out by an insurance agent acting in the scope of his agency."); *Morrison v. Swenson*, 142 N.W.2d 640, 644-46 (Minn. 1966) (whether an independent insurance agent is acting as a broker or as an agent of the insurance company is a question of fact).

*Risk*, 152 N.W.2d at 483; *Ins. Co. of Penn. v. Hoffman*, 814 F. Supp. 782, 786 (D. Minn. 1993). If the insurer would be more likely to incur liability under the facts that *should* have been disclosed than under the facts that *were* disclosed, then the matter misrepresented increased the risk of loss. *Sec. Mut. Cas. Co. v. Affiliated FM Ins. Co.*, 471 F.2d 238, 242-43 (8th Cir. 1972) (applying § 60A.08).

In order to prove that a matter misrepresented increased the risk of loss, the insurer must demonstrate that it reasonably relied on the misrepresentation when it decided to issue the insurance policy. *Old Republic Ins. Co. v. Erickson*, No. 04-1398, 2005 WL 3487954, at *2 (D. Minn. Dec. 21, 2005). In other words, the insurer must demonstrate that, but for the misrepresentation, it would not have insured the risk *at all*. If the insurer would have covered the same risk, but simply charged a higher premium, then the matter misrepresented did not increase the risk of loss to the insurer. *See Hoffman*, 814 F. Supp. at 786 & n.11. That "risk" would have been the same, as the insurer would have written the same coverage; the only difference would have been the amount charged for that coverage.

In this case, Interstate offers evidence that, had Ulven disclosed Vanyo's identity and driving record, Interstate would have listed Vanyo on the "Named Driver Exclusion" endorsement to the Policy. *See* Sisneros Dep. 34 ("We, more than likely, would have asked for an exclusion or asked that he be put in a capacity other than driving"). That endorsement applies the following exclusion to the drivers specifically named in the endorsement: "This insurance policy does not cover any claim or 'loss' arising from 'accidents' or occurrences involving any covered 'auto' while being driven or operated by: [listed drivers]." *See* Policy at 8. As Interstate sees it, then, had Ulven disclosed Vanyo's identity and driving record, Interstate would not have

written *any* coverage of Vanyo — that is, no one harmed by Vanyo would have any right to insurance benefits under the Policy.

Ulven disagrees. According to Ulven, while listing Vanyo on the "Named Driver Exclusion" would preclude Ulven (or anyone else injured by Vanyo) from recovering under the Policy's *liability* coverage, it would not preclude Ulven from recovering *PIP benefits*. *See* Minn. Stat. § 65B.49, subd. 1 (requiring motor-vehicle insurance policies to include coverage for basic economic-loss benefits); *Iverson v. State Farm Mut. Auto. Ins. Co.*, 295 N.W.2d 573, 575 (Minn. 1980) (because it was inconsistent with policy behind Minnesota's No-Fault Act, exclusion for bodily injury arising out of use of uninsured vehicle owned by insured could not preclude recovery of basic economic-loss benefits); *see also Am. Motorist Ins. Co. v. Sarvela*, 327 N.W.2d 77, 79 (Minn. 1982) ("Policy exclusions which attempt to prevent [first-party] coverage from following the person are inconsistent with the purposes of the Minnesota No-Fault Act."). As a result, Ulven argues, the misrepresentation did not increase Interstate's risk of incurring *PIP liability*.[6]

Interstate has not responded to this argument, possibly because Ulven's briefing raised it only obliquely. Indeed, the Court itself did not fully comprehend Ulven's contention until the second hearing on Interstate's motion. Although the issue is complicated, and the briefing is regrettably sparse, it appears to the Court that Ulven may be correct that including Vanyo on the "Named Driver Exclusion" would not have excluded PIP coverage in this case, and thus Ulven's failure to tell Interstate of Vanyo or his bad driving record did not increase Interstate's risk of

---

[6]Ulven also argues that the "Named Driver Exclusion" would not preclude UM/UIM coverage. As discussed below, however, Ulven does not qualify as an "insured" for purposes of UM/UIM coverage for the January 2006 accident, and it is thus irrelevant whether the "Named Driver Exclusion" would independently preclude UM/UIM coverage for the accident.

PIP liability. The Court will therefore deny Interstate's motion for summary judgment on voidability, but without prejudice to Interstate's ability to raise the issue of the validity and effect of the "Named Driver Exclusion" at a later time.

## 2. UM/UIM Benefits

The UM/UIM endorsement to the Policy provides coverage for "all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured motor vehicle' or 'underinsured motor vehicle'." Policy at 46. Interstate argues that Ulven is not eligible for UM/UIM benefits because he is not an "insured" under the UM/UIM endorsement. The Court agrees.

The UM/UIM endorsement defines an insured as:

1. You.
2. If you are an individual, any "family member".
3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, loss or destruction.
4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

Policy at 46. None of these definitions applies to Ulven. "You" refers to Buy-Rite, the named insured, not to Ulven.[7] Buy-Rite is a corporation, and thus Ulven is obviously not a "family member" of the named insured. Ulven was not occupying a covered auto at the time of the accident; he was on foot. Finally, Ulven is not attempting to recover damages to which he is

---

[7] *See* Policy at 23 ("Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations."); Policy at 1 (identifying Buy-Rite as the named insured).

entitled because of a bodily injury sustained by *another* insured.[8]  He is trying to recover damages for a bodily injury that *he* sustained.

Clearly, then, Ulven does not qualify as an "insured" under the UM/UIM endorsement. Ulven nevertheless argues that this Court should ignore the plain language of the Policy and deem Ulven to be an "insured" for purposes of the UM/UIM endorsement under the "reverse-pierce" theory recognized in *Roepke v. Western National Mutual Insurance Co.*, 302 N.W. 2d 350 (Minn. 1981).  In *Roepke*, the plaintiff's decedent was the president and sole shareholder of the insured corporation.  *Id.* at 351.  The corporation owned six vehicles.  *Id.*  The decedent and his family did not personally own any vehicles, but used all six of the corporation's vehicles as family vehicles.  *Id.*  Under these circumstances, the Minnesota Supreme Court "reverse pierced" the corporate veil and held that the decedent should be viewed as an insured under a policy that, on its face, insured only the corporation.  *Id.* at 352.

Ulven argues that, under *Roepke*, the Court should disregard Buy-Rite's corporate form and find that Ulven qualifies as an "insured" under the UM/UIM endorsement.  Ulven points out that the facts in this case are very similar to the facts in *Roepke*:  Ulven is Buy-Rite's sole shareholder; Ulven's wife, Mavis Ulven, used Buy-Rite vehicles as her own; and neither of the Ulvens owned any other vehicles.[9]

———————————————

[8]The UM/UIM endorsement provides coverage only for damages resulting from bodily injury to an insured.  Policy at 46.  Obviously, as Buy-Rite is a corporation, it cannot sustain bodily injury.  The Minnesota Supreme Court has rejected the argument that a similar UM/UIM policy issued to a corporation was a nullity, noting that the UM/UIM coverage also extended to occupants of the insured vehicles.  *Kaysen v. Fed. Ins. Co.*, 268 N.W.2d 920, 923-24 (Minn. 1978); *see also Lundgren v. Vigilant Ins. Co.*, 391 N.W.2d 542, 544-45 (Minn. Ct. App. 1986) (following *Kaysen*).  Similarly, here the UM/UIM coverage in the Policy extends to occupants of covered vehicles that are out of service.  Policy at 46.

[9]Ulven has not had a valid driver's license for at least six years.  Ulven II Dep. 110-11.

-17-

Ulven is correct that the facts in this case are similar to those in *Roepke*, but later Minnesota cases (as well as *Roepke* itself) make clear that similar facts are not good enough; the facts must be nearly identical for *Roepke* to control. In *Roepke*, the Minnesota Supreme Court — perhaps recognizing that it was climbing out on a juridical limb — repeatedly stressed that the facts of the case were "unique" and "peculiar." At the end of its opinion, the Court expressly limited its holding to those "unique" and "peculiar" facts:

> [W]e limit this holding to the facts peculiar to this case, the most significant of which are that decedent was the president and sole shareholder of the named insured corporation; the vehicles insured by defendant were used as family vehicles; and neither decedent nor members of his household owned any other vehicles.

*Roepke*, 302 N.W.2d at 353.

In the years following *Roepke*, the Minnesota courts have made clear that *Roepke* is an outlier that has no application beyond its precise facts. For example, in *Kuennen v. Citizens Security Mutual Insurance Co.*, the plaintiff's decedent was the majority shareholder of the insured corporation, which had only one other shareholder. 330 N.W.2d 886, 886 (Minn. 1983). The decedent treated two of the insured corporation's four vehicles as personal vehicles, and the decedent's family owned no other vehicles. *Id.* Nevertheless, the Minnesota Supreme Court refused to extend its very recent *Roepke* opinion because, it explained, two of the three "significant" facts were missing: the decedent was not the corporation's sole shareholder and only some of the corporation's vehicles were used as family vehicles. *Id.* at 887. The court called these distinctions "crucial." *Id.*

Here, Ulven is a bit closer to the mark in that he, unlike the decedent in *Kuennen*, is the sole shareholder of Buy-Rite. But there is still one factor missing: The Ulven family did not use all of Buy-Rite's cars as personal vehicles. As a used-car dealer, Buy-Rite has owned hundreds,

perhaps thousands, of cars; there is no dispute that Mavis Ulven has made personal use of only a handful of them. In other words, whereas in *Roepke* the sole shareholder and his family treated *all* of the corporation's vehicles as their own, in this case something like ninety-nine percent of the corporation's vehicles were *not* treated as the personal property of the Ulvens.

Ulven contends that this distinction is unimportant because Buy-Rite sells used cars, and no owner of such business could treat all of business's hundreds of cars as his own. As *Kuennen* makes clear, though, the importance of the *Roepke* factors lies in the degree to which they indicate that the shareholder and the corporation are one and the same:

> Ownership of corporate shares and use of corporate property are important because they indicate the degree of identity between a shareholder and a corporation. Where that degree is not high the alter ego theory which underlies the doctrine of piercing the corporate veil cannot operate. We, therefore, adhere to our statement in *Roepke* that the rule there announced has only very particular application. We did not intend *Roepke* as the first step toward apportioning corporate policies to shareholders on the basis of stock ownership and number of company cars put to family use.

*Kuennen*, 330 N.W.2d at 887.

As this passage indicates, *Roepke* does not stand for the proposition that a shareholder's use of company cars entitles him to be considered an insured under policies issued to the corporation. Instead, the result in *Roepke* was driven by the fact that, as the shareholder's personal use of *all* of the company's cars demonstrated, there was no meaningful distinction between the corporation and the shareholder. They had, in the words of *Kuennen*, a high "degree of identity." *Id.*

Here, unlike *Roepke*, there is a clear distinction between Buy-Rite's property and Ulven's property, and consequently there is a clear distinction between Buy-Rite and Ulven. Other than permitting his wife to use a small number of vehicles, Ulven properly observed all corporate

formalities and treated Buy-Rite as a corporation separate from himself. If someone were injured by the acts of a Buy-Rite employee, there is almost no chance that a court would pierce the corporate veil and hold Ulven personally liable. For the same reason, this Court will not "reverse pierce" and hold that Buy-Rite and Ulven are one and the same for purposes of the Policy. Instead, the Court will follow *Kuennen* and decline to extend *Roepke* to a case in which *Roepke*'s three "peculiar" and "unique" facts are not all present. Interstate's motion for summary judgment is granted with respect to Ulven's claim for coverage under the UM/UIM endorsement.

### 3. PIP Benefits

The PIP endorsement to the Policy provides coverage for "'bodily injury sustained by an 'insured' caused by an 'accident' arising out of the maintenance or use of a 'motor vehicle' as a vehicle . . . ." Policy at 50. Interstate concedes that Ulven qualifies as an insured under the PIP endorsement (which defines "insured" differently than the UM/UIM endorsement), but argues that coverage is excluded under the "business premises" exclusion to the PIP endorsement. Interstate bears the burden of proving that the business-premises exclusion applies, and any ambiguity in the exclusion is strictly construed against Interstate.[10] *See Am. Family Ins. Co. v.*

---

[10]As explained in the main text, the business-premises exclusion derives from a statute. *See* Minn. Stat. § 65B.43, subd. 3. One could plausibly argue, therefore, that the exclusion should not be construed against the insurer. *Cf. Horace Mann Ins. Co. v. Goebel*, 504 N.W.2d 278, 280-81 (Minn. Ct. App. 1993) (analyzing the business-premises exclusion of § 65B.43 without discussing the need to strictly construe exclusions against the insurer); *Midwest Family Mut. Ins. Co. v. Karpe*, 430 N.W.2d 856, 860 (Minn. Ct. App. 1988) (same); *Himle v. Am. Family Mut. Ins. Co.*, 445 N.W.2d 587, 590 (Minn. Ct. App. 1989) ("A liability policy which expressly states that it was issued to meet a statute requiring motor vehicle liability insurance must be construed in connection with that statute and the public policy embodied therein, and principles applicable to cases involving ordinary policies are not controlling.") (citation and quotations omitted). At oral argument, however, Interstate conceded that the business-premises exclusion must be construed against it.

*Walser*, 628 N.W.2d 605, 613 (Minn. 2001); *State Farm Ins. Cos. v. Seefeld*, 481 N.W.2d 62, 64

(Minn. 1992); *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d

645, 652 (Minn. 1986).

The business-premises exclusion provides as follows:

> We will not pay Personal Injury Protection benefits for "bodily
> injury": . . .
>
> 6.    Sustained by any person if such injury arises out of conduct
>       within the course of a business of repairing, servicing, or
>       otherwise maintaining "motor vehicles" unless such
>       conduct occurs off the business premises.

Policy at 51-52.  This exclusion derives from the Minnesota No-Fault Automobile Insurance

Act, Minn. Stat. §§ 65B.41 et seq., which mandates certain types of coverage for losses from

injuries arising out of the maintenance or use of a motor vehicle.  Minn. Stat. § 65B.46, subd. 1;

Minn. Stat. § 65B.49, subd. 1.  The No-Fault Act's definition of "maintenance" excludes

"conduct within the course of a business of repairing, servicing, or otherwise maintaining motor

vehicles unless the conduct occurs off the business premises . . . ."  Minn. Stat. § 65B.43,

subd. 3.

Interstate argues that the business-premises exclusion applies because the accident

occurred on Buy-Rite's business premises and arose out of conduct within the course of a

business of repairing, servicing, or otherwise maintaining motor vehicles.  Interstate focuses on

the meaning of the phrase "otherwise maintaining," arguing that Minnesota courts have

interpreted "maintenance" broadly in the context of the No-Fault Act.  *See Brehm v. Ill. Farmers

Ins. Co.*, 390 N.W.2d 475, 477 (Minn. Ct. App. 1986) (plaintiff's injuries from a fall while

washing windows of a truck arose out of maintenance of a motor vehicle because "[r]efueling

and washing windows constitute maintenance within the plain meaning of the statute").  Under

this definition of "maintenance," Interstate argues, Vanyo's job clearly involved maintaining vehicles. Moreover, Buy-Rite apparently employed a part-time mechanic to clean, prep, and perform basic maintenance on Buy-Rite's vehicles. Vanyo II Dep. 42-44.

The Court agrees with Interstate that Vanyo and the part-time mechanic maintained motor vehicles within the meaning of the Policy; indeed, Ulven conceded as much at oral argument. But that is not the end of the inquiry. The issue is whether Ulven's injuries arose out of conduct that occurred "within the course of a business of repairing, servicing, or otherwise maintaining 'motor vehicles' . . . ." In other words, the crucial question under the exclusion is not whether *Vanyo* maintained motor vehicles; the crucial question is whether *Buy-Rite* was in the *business* of repairing, servicing, or otherwise maintaining motor vehicles.

There are no Minnesota cases addressing the meaning of the phrase "the course of a business of repairing, servicing, or otherwise maintaining 'motor vehicles,'" but the Court finds persuasive the reasoning of *Nationwide Mutual Insurance Company v. McCollum*, 347 S.E.2d 231 (Ga. Ct. App. 1986). In *McCollum*, the insured was injured during the course of his employment by an interstate trucking company. *Id.* at 232. The insured's job was to ensure that the company's trucks were roadworthy by checking their fluids, lights, and tires. *Id.* The Georgia Court of Appeals held that Georgia's business-premises exclusion — which at the time was identical in all relevant respects to the exclusion in § 65B.43 — did not preclude coverage. *Id.* at 233-34; *see* Ga. Code Ann. § 33-34-2(9) (1982). The court explained that the language of the statute focuses on the nature of the business rather than the nature of the insured's employment:

> [A]lthough Plaintiff was employed as a truck servicer, he was not
> employed by a truck servicing business. The legislature could
> easily have altered the language to express lack of coverage for a

> person employed as a repairer or servicer of motor vehicles but
> chose to focus on the nature of the business rather than the
> employee.

*McCollum*, 347 S.E.2d at 233-34.  Because the trucking company was not in the automobile-repair business, the court held that the business-premises exclusion did not apply.

This Court follows *McCollum*'s lead.  Practically any business that owns vehicles will ask its employees to perform basic maintenance, such as refueling and washing windows.  Someone employed by a bakery will refuel the delivery truck; someone employed by a day-care center will wash the windows of the van used to take the children on field trips.  That does not mean that the bakery or the day-care center is in the business of maintaining motor vehicles.  Similarly, Buy-Rite is in the business of selling used cars.  The fact that Buy-Rite maintains those cars, and the fact that such maintenance is critical to its operation, no more means that Buy-Rite is in the business of maintaining cars than similar facts would mean that an overnight delivery service, or florist, or a pizza-delivery business is in the business of maintaining cars.

Because Buy-Rite is in the business of selling used cars, and not in the business of repairing, servicing, or otherwise maintaining motor vehicles, the business-premises exclusion to the PIP endorsement does not apply.  Thus, to the extent that Interstate's summary-judgment motion rests on the argument that PIP benefits are precluded under the business-premises exclusion, that motion is denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment [Docket No. 61] is GRANTED IN
   PART and DENIED IN PART.

2.     The motion is GRANTED with respect to plaintiff's claim that it owes no duty to

defend or indemnify defendants Alerio Vanyo and Buy-Rite Auto Sales, Inc.

under Policy No. GP6129549 against any claims arising out of the January 14,

2006 accident involving Vanyo and defendant Ronald Ulven.  Ulven's

counterclaim to the contrary is DISMISSED WITH PREJUDICE AND ON THE

MERITS.

3.     The motion is GRANTED with respect to plaintiff's claim that it has no

obligation to provide uninsured or underinsured motorist benefits under Policy

No. GP6129549 to Ulven in connection with the January 14, 2006 accident

involving Vanyo and Ulven.  Ulven's counterclaim to the contrary is

DISMISSED WITH PREJUDICE AND ON THE MERITS.

4.     The motion is DENIED in all other respects.


Dated: July  22 , 2009                                     s/Patrick J. Schiltz                                    
                                                           Patrick J. Schiltz
                                                           United States District Judge